**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| ATRIUM COMPANIES, INC. and CHAMPION WINDOW, INC., | § § § | |
| Plaintiffs, | § § | |
| v. | § § | CIVIL ACTION NO. H-11-1288 |
| ESR ASSOCIATES, INC., | § § | |
| Defendant. | § § § | |
| | § | |
| ESR ASSOCIATES, INC., | § § | |
| Counter-Claimant, | § § | |
| v. | § § | |
| ATRIUM COMPANIES, INC. and CHAMPION WINDOW, INC., | § § § § | |
| Counter-Defendants. | § | |

**MEMORANDUM AND ORDER ON DEFENDANT/COUNTER-CLAIMANT'S
MOTIONS FOR SUMMARY JUDGMENT**

On December 2, 2011, the parties consented to proceed before a United States magistrate

judge for all further proceedings, including trial and entry of a final judgment, under 28 U.S.C.

§ 636(c). (Docket Entry # 21). This case arose out of a business dispute between Plaintiffs and

Counter-Defendants Atrium Companies, Inc. ("Atrium") and Champion Window, Inc. ("Champion")

(collectively, "Plaintiffs"), and Defendant and Counter-Claimant ESR Associates, Inc. ("ESR",

"Defendant"). Pending before the court are two motions for summary judgment filed by Defendant.

(Defendant/Counter-Claimant's First Motion for Summary Judgment ["First Motion"], Docket Entry

#43; Defendant's Second Motion for Summary Judgment ["Second Motion"], Docket Entry #44). Plaintiffs have responded in opposition to these motions, and Defendant has replied. (Plaintiffs' Response to Defendant/Counter-Claimant's First Motion for Summary Judgment ["Response to First Motion"], Docket Entry #53; Plaintiffs' Response to Defendant's Second Motion for Summary Judgment ["Response to Second Motion"], Docket Entry #54; Defendant/Counter-Claimant's Reply to Plaintiffs' Response to Defendant/Counter-Claimant's First Motion for Summary Judgment ["Reply to First Motion"], Docket Entry # 64; Defendant's Reply to Plaintiffs' Response to Second Motion for Summary Judgment ["Reply to Second Motion"], Docket Entry #65).  After a review of the pleadings, the evidence provided, and the applicable law, it is **ORDERED** that Defendant's first motion for summary judgment is **DENIED,** and that Defendant's second motion for summary judgment is **GRANTED**, in part, and **DENIED**, in part

**Background**

The facts leading to this litigation have been detailed in a previous memorandum, but to provide context for the pending motion, certain of them bear repeating on this contract dispute. (*See* Docket Entry #58).  Atrium Companies, Inc., manufactures and distributes vinyl and aluminum windows and patio doors for residential homes and "light commercial applications." (Plaintiffs' Second Amended Complaint ["Complaint"], Docket Entry #59, at ¶ 6).  Champion Window, Inc., is a subsidiary of Atrium, and is located in Houston, Texas.[1]  (*Id.* at ¶ 10).  Champion previously operated a window manufacturing facility, and its products were available "throughout the State of

---

[1]    Although Champion's "principal place of business" is Houston, Texas, it is a Delaware corporation. (Complaint at ¶ 2).

2

Texas."[2]   (*Id.* at ¶ 6; Response to Second Motion at Exhibit ["Ex."] 3; Reply to Second Motion at Ex. A ["Patterson Report"], at 1).  ESR Associates, Inc., installs software programs for companies to "facilitate the flow of information between business functions."  (Complaint at ¶ 7).  These software programs implement "enterprise resource planning," which integrates business functions "such as finance, manufacturing, sales, and services." (*Id.*).  On January 23, 2009, Atrium and ESR entered into a "Master Agreement," which provided that Defendant "would render technical services to Atrium in connection with [its] information systems."  (Second Motion at Ex. A ["Master Agreement"]).   The parties further agreed that they would "enter into a separate acceptance confirmation agreement for each project" specific to any of Atrium's subsidiaries.  (Complaint at ¶ 9).  On May 17, 2010, Atrium and Defendant entered into a separate "Implementation Agreement," for ESR to install the "Oracle E-Business Suite" software package for the Champion facility in Houston.  (Response to Second Motion at Ex. B).  It is that "Implementation Agreement" which serves as the basis for Plaintiffs' complaints.

Plaintiffs claim that, in November 2009, Reece Gardener ("Gardener"), an ESR consultant and the Project Manager for Champion's Oracle implementation, visited the facility to learn about the business, and to assess whether the "Oracle e-business suite" could support its operations. (Response to Second Motion at 3).  Based on Gardener's research, ESR presented an "assessment and study analysis" presentation to Plaintiffs, in which it recommended implementing the Oracle software program at the Champion facility.  (Complaint at 3).   Defendant represented that the benefits of the software package would include "manufacturing planning[,] [] scheduling

---

[2]   Champion's Houston-based manufacturing facility closed in December 2011.  (Second Motion at Ex. 3A).

capabilities, inventory planning[,] [] tracking tools, and real time information to manage the business." (*Id*.). This information was detailed in the Implementation Agreement that the parties entered into in May 2010. (*Id*. at 4; Response to Second Motion at Ex. B ["Implementation Agreement"], at 43-46). The Implementation Agreement established a time line for the project's various phases. (Complaint at 5). The start date was to be June 1, 2010, and the Oracle implementation was to "go live" on November 1, 2010 ("Go-Live" date). (*Id*).

The project began, as planned, in June 2010. However, Plaintiffs allege that once the project was underway, ESR failed "to meet crucial deadlines," and "failed to provide adequate consultants to render the services required throughout the Oracle Implementation." (*Id*. at ¶¶19–20). Due to these failures, "numerous problems" arose when the Oracle implementation "went live" in November 2010. (*Id*. at 8). Among the problems Champion allegedly experienced were "[i]ncomplete shipments to customers," the "[i]nability to place orders and invoice for the proper amounts," "[n]o visibility of customer orders for manufacturing purposes," the "inability to track and value inventory accurately," and the "inability to track accounts receivable." (*Id*. at ¶ 27). Due to these problems, Plaintiffs claim that the Champion facility "lost significant productivity" and received "numerous and serious customer complaints." (*Id*. at ¶ 28). Plaintiffs also allege that they were forced to hire additional employees and to "contract with additional consulting firms" in order to remedy the problems. (*Id*.). Finally, Plaintiffs contend that there has been a "significant increase in [] past due accounts receivable." (*Id*.). They explain that, in response to these problems, Atrium withheld its final payment of $76,580 to ESR, and that they proceeded to file this lawsuit. (*Id*. at 9-10).

Plaintiffs originally filed this case in the 164th Judicial District Court of Harris County, Texas, on February 21, 2011. (Docket Entry # 1 at ¶ 6 & Ex. A-1). In their present Complaint, Plaintiffs bring claims for breach of contract, breach of warranty, negligent misrepresentation, "information technology professional negligence," and gross negligence. (Complaint at 10-15). Plaintiffs also seek a declaratory judgment that "Atrium does not owe ESR th[e] final payment in the amount of $76,580"; "that ESR breached the contracts"; and that "Atrium is entitled to recover [] reasonable and necessary attorneys' fees." (Id. at 15). On April 6, 2011, Defendant removed the case to federal court on the basis of diversity jurisdiction. (Id. at 3). Subsequently, Defendant filed a counter-claim against Plaintiffs for the balance due on the contract, plus attorneys' fees and court costs. (Defendant ESR Associates, Inc.'s Second Amended Answer and Counter-Claim ["Counter-Claim"], Docket Entry #62). In particular, Defendant claims that it completed its work under the "Master Agreement," and that Atrium then "agreed to compensate Defendant for two weeks through the last week of November 2011," and now owes it the sum of $76,580. (See First Motion at 2 & Ex. B). Defendant contends that it submitted invoices to Plaintiffs for that amount, but that, to date, payment has not been received. (Id.).

In its first motion, ESR seeks summary judgment on its counter-claim. In this motion, Defendant argues that Plaintiffs are not entitled to withhold payment because they never reported dissatisfaction with ESR's work. (First Motion at 2). Defendant insists that "Atrium had not complained that the work was NOT done or that the hours were NOT expended." (Id. at 3). In response, Plaintiffs counter that ESR breached the contract by failing to perform under its terms, and that, as a consequence, their non-payment is excused. (Response to First Motion at 16). Plaintiffs

5

also argue that ESR has presented  no evidence to verify that its claimed "attorney's hours" were "reasonable" and "necessary." (*Id.* at 17-19).

In its second motion for summary judgment, Defendant seeks summary judgment on Plaintiffs' claims, arguing that Atrium has not met all of the conditions the contract required. (Second Motion at 4-9). ESR claims, specifically, that, because Plaintiffs never notified it that they were dissatisfied with Defendant's work, they have waived their right to claim a breach of contract. (*Id.* at 4-5). ESR also contends that the contract limits Plaintiffs' damages to the costs incurred to replace its consultants. (*Id.*). ESR further alleges that the "economic loss rule" precludes Plaintiffs' claims for professional negligence, gross negligence, and negligent misrepresentation. (*Id.* at 5-9). Finally, Defendant argues that Plaintiffs' breach of warranty claim fails because the contract does not contain any "warranty." (*Id.* at 9-10).  In response, Plaintiffs assert that fact questions remain, so that summary judgment is not appropriate on their breach of contract claim. (Response to Second Motion at 15-16).

After a review of the pleadings, the evidence, and the applicable law, the court finds that Defendant's first motion for summary judgment should be denied, and that Defendant's second motion for summary judgment should be granted, in part, and denied, in part.  As a result of this determination, only the parties' claims that pertain to breach of contract and breach of warranty remain pending for trial.

**Standard of Review**

Summary judgment is appropriate when "'the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant[] [is] entitled to judgment as a matter of law.'" *Pustejovsky v. Pliva, Inc.*, 623 F.3d

271, 275-76 (5th Cir. 2010) (quoting FED. R. CIV. P. 56(c); citing *Breaux v. Halliburton Energy Servs.*, 562 F.3d 358, 364 (5th Cir. 2009)). "'Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving part[ies], there is no genuine issue for trial.'" *Hillman v. Loga*, ___ F.3d ___, 2012 WL 4465194, at *2 (5th Cir. Sept. 28, 2012) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). Under Rule 56(c), the moving party "bears the initial burden of 'informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact.'" *Taita Chem. Co. v. Westlake Styrene Corp.*, 246 F.3d 377, 385 (5th Cir. 2001) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); *see Malacara v. Garber*, 353 F.3d 393, 404 (5th Cir. 2003). The party moving for summary judgment "'must demonstrate the absence of a genuine issue of material fact,' but 'need not negate the elements of the non-movant[s'] case.'" *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)); *see Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996). If the moving party fails to meet its initial burden, its motion for summary judgment must be denied, regardless of the non-movants' response. *See Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir. 2001); *Little*, 37 F.3d at 1075.

When the moving party has met its Rule 56 burden, the non-moving parties cannot merely rest on the allegations in their pleadings. *See Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349-50 (5th Cir. 2005); *McCallum Highlands, Ltd. v. Washington Capital Dus, Inc.*, 66 F.3d 89, 92 (5th Cir. 1995). Rather, they are required to "'go beyond the pleadings'" and produce probative evidence to show "'that there is a genuine issue for trial.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075; citing *Matsushita Elec. Indus. Co.*, 475 U.S. at 586-87); *see Izen v. Catalina*, 398 F.3d 363,

366 (5th Cir. 2005); *Taita Chem. Co.*, 246 F.3d at 385.  If they do so, their evidence "is to be

believed, and all justifiable inferences are to be drawn in [their] favor." *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 248 (1986); *see Hillman*, 2012 WL 4465194, at *2; *Taita Chem. Co.*, 246 F.3d

at 385.  However, if the non-movants fail to respond appropriately, or if they fail to respond at all,

summary judgment is not awarded to the moving party simply by default.  *See Ford-Evans v. Smith*,

206 Fed. Appx. 332, 334 (5th Cir. 2006); *Hetzel v. Bethlehem Steel Corp.*, 50 F.3d 360, 362 n.3 (5th

Cir. 1995); *Hibernia Nat'l Bank v. Administracion Cent. Soc. Anonima*, 776 F.2d 1277, 1279 (5th

Cir. 1985); *John v. State of La.*, 757 F.2d 698, 708 (5th Cir. 1985).  Instead, as always, summary

judgment is appropriate only if the moving party has demonstrated the absence of a genuine issue

of material fact, and shown that judgment is warranted as a matter of law.  *See Adams v. Travelers*

*Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006); *Hetzel*, 50 F.3d at 362 n.3 (quoting *Hibernia*

*Nat'l Bank*, 776 F.2d at 1279).

**Discussion**

 Defendant's second motion for summary judgment is broader and, as a result, the court will

address it before it considers ESR's first motion.

 *Breach of Contract Claim*

 In their complaint, Plaintiffs allege that ESR breached the Master Agreement and

Implementation Agreement by the following acts or omissions:

> (1) failing to complete the work, project activities, phases and deliverables set forth
> in the Project Contract in accordance with the schedule; (2) failing to monitor the
> progress of the Oracle Implementation and make every effort to adhere to the
> schedule of dates and complete the engagement in time; (3) otherwise failing to
> implement the Oracle E-Business suite as set forth in the Project Contract; and (4)
> going live with the Oracle Implementation before the system was ready.

8

(Complaint at 11).  In Texas, it is well-settled that to establish a breach of contract, a plaintiff must allege the existence of a contract, the performance or tender of performance by the plaintiff, a breach by the defendant, and damages as a result of that breach.  *See Bridgmon v. Array Sys. Corp.*, 325 F.3d 572, 577 (5th Cir. 2003).  In its second motion, ESR points to the Master Agreement as the contract between the parties.  (Second Motion at 5).  It states that Atrium and ESR executed the Master Agreement with the intent that it govern the relationship between the parties.  (*Id.* at 5 & Ex. 1, at 1-2).  In support of its second motion for summary judgment, Defendant cites a paragraph in the Master Agreement to show that Plaintiffs were required to provide ESR with notice if they were dissatisfied with the consultants' work.  (*Id.* at 5).  That notification requirement is detailed below:

> ESR agrees to immediately remove any consultant in case the quality of services performed by the consultant is not acceptable to [Atrium], *if brought to ESR's attention.*  [Atrium] agrees to pay at the rate designated in the Acceptance Confirmation Agreement for those hours worked by ESR's representative prior to termination.  Any unsatisfactory work must be addressed immediately to avoid unproductive time spent and the associated costs.

(*Id.* [emphasis added]).  ESR argues that, because Plaintiffs "failed to abide by the notice requirements of the contract," they have waived any claim under it.  (*Id.*).

Under Texas law, "[w]aiver is an intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right." *Sun Exploration & Prod. Co. v. Benton,* 728 S.W.2d 35, 37 (Tex. 1987).  "Ordinarily, the existence of a waiver is a question of fact, based upon what is said and done." *Guzman v. Ugly Duckling Car Sales of Tex., LLP*, 63 S.W.3d 522, 528 (Tex. App.—San Antonio 2001, pet. denied).  "In order to establish a waiver of rights under a contract, there must be proof of an intent to relinquish a known right." *Roberts v. Clark*, 188 S.W.3d 204, 213 (Tex. App.—Tyler 2002, pet. denied).  Further, "[i]n determining if a waiver has ... occurred, the

9

court must examine the acts, words or conduct of the parties, and it must be 'unequivocally manifested' that it is the intent of the party to no longer assert the right." *Guzman,* 63 S.W.3d at 528 (quoting *Enterprise-Laredo Assocs. v. Hachar's Inc.,* 839 S.W.2d 822, 836 (Tex. App.—San Antonio 1992, writ denied)).

As evidence of waiver in this case, ESR has submitted an affidavit from John Seitz ("Seitz"), the "sales person involved in the Contract between ESR and Atrium/Champion." (Second Motion at Ex. 2 ["Seitz Affidavit"] at 1). Seitz states that following Atrium's failure to pay the final invoices for ESR's work at the Champion facility, he contacted Plaintiff's CEO, Kevin O'Meara ("O'Meara"), regarding the past due amount. (*Id.* at 1-2). Seitz states that Mr. O'Meara informed him that "Atrium had complaints about the work product of ESR." (*Id.*). Seitz states further that "[t]his was the first occasion that ESR was put on notice of a complaint about its work product," and that "[a]t no point was ESR given an opportunity to cure any alleged defect in its work or was [it] previously provided notice of default under the contract." (*Id.* at 2). To find that Plaintiffs waived their rights under the contract, their actions must have "unequivocally manifested" an intent to abandon any rights under it. *See Guzman,* 63 S.W.3d at 528 .

To show that they did not intend to disclaim their contractual rights, Plaintiffs here have submitted a number of emails exchanged between their employees and the ESR consultants on the Champion project. (Response to Second Motion at Ex. D. ["Beth Lee Affidavit"], at Exs. B and C). The emails are described through an affidavit from Beth Lee ("Lee"), Atrium's Director of eCommerce. (*See id.*). ESR objects to these emails as a whole, but offers no law in support of this blanket objection. Defendant argues that Lee "is not a business records custodian but purports to attach true and correct copies of certain business records." (Reply to Second Motion at 9).

10

Rule 803(6) of the Federal Rules of Evidence contains a "business records" exception to the hearsay rule. *See* FED. R. EVID. 803(6); *Rock v. Huffco Gas & Oil Co.*, 922 F.2d 272, 279 (5th Cir. 1991); *see also Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mex., on April 20, 2010*, 2012 WL 85447, at *3-4 (E.D. La. Jan. 11, 2012); *Cantaxx Gas Storage Ltd. v. Silverhawk Capital Partners, LLC*, 2008 WL 1999234, at *12 (S.D. Tex. May 8, 2008). "[T]he rationale underlying this exception to the rule against hearsay is that the inherent reliability of business records is 'supplied by systematic checking, by regularity and continuity which produce habits of precision, by actual experience of business in relying upon them, or by a duty to make an accurate record as part of a continuing job or occupation.'" *United States v. Wells*, 262 F.3d 455, 462 (5th Cir. 2001) (quoting FED. R. EVID. 803(6) Committee Note); *see Rock*, 922 F.2d at 279 . "Whether evidence is admissible under Rule 803(6) is chiefly a matter of trustworthiness." *Wells*, 262 F.3d at 462. Ordinarily, a party that seeks to introduce an email made by an employee about a business matter under this hearsay exception must show that the employer imposed a business duty to make and maintain such a record. *See Cantaxx, LLC*, 2008 WL 1999234, at *12. However, at least one court from this circuit has admitted email that was prepared "during the course of ordinary business," without addressing whether the employee was under a duty to make and maintain those communications. *See Pierre v. RBC Liberty Life Ins.*, 2007 WL 2071829, at * 2 (M.D. La. July 13, 2007).

Moreover, there are other avenues through which emails may be admitted into evidence. One such avenue is "adoptive admissions," under Rule 801(d)(2) of the Federal Rules of Evidence. *See Deepwater Horizon*, 2012 WL 85447, at * 4. Indeed, such statements are not considered hearsay. *See id*. Instead, it is a statement made by a party, in an email or otherwise, that is offered against that party. *See id*. Under this rule, even an email that has been forwarded may be admitted "if it is clear

that the forwarder adopted the content or believed in the truth of the content." *Id*. However, while

these rules are helpful in examining the emails at hand, it is equally important to emphasize that it

is Defendant's burden to prove that any particular correspondence is inadmissible.

> Indeed,

> [i]f the administration of the exclusionary rules of evidence is to be fair and
> workable, the judge must be informed promptly of contentions that evidence should
> be rejected, and the reasons supporting the contentions. The burden is placed on the
> party opponent, not the judge. Accordingly, the general approach is that a failure to
> make a specific objection at the time the offer is made, is a waiver on appeal of any
> ground of complaint against its admission.

1 McCormick on Evidence § 52, at 204–05 (Strong ed. 1992). Here, it is ESR's burden to object

to any particular email that it posits to be unreliable. *See id*. It has not done so. In fact, all of the

emails that Lee has introduced come from her own electronic mail account and pertain to the Oracle

Implementation project. They appear to have been created "during the ordinary course of business,"

and are admissible under the business records exception to the hearsay rule. *See Pierre*, 2007 WL

2071829, at *2. In addition, many of the emails contain statements from ESR consultants

themselves. For instance, in one email, an ESR consultant, Dave Williams ("Williams"),

acknowledged to Lee that a particular project delay "f[ell] into the domain of his fault." (Beth Lee

Affidavit at Ex. B). *See Deepwater Horizon*, 2012 WL 85447, at * 4. Because Defendant has not

objected to any particular email as unreliable, and because there does not appear to be any reason to

question their reliability, it is appropriate to consider them in this instance. *See Wells*, 262 F.3d at

462.

On review, it is clear that the emails date from before and after the "Go-Live" date of

November 1, 2010. (Beth Lee Affidavit at Exs. B and C). In one of the earliest emails, dated

September 29, 2010, Lee admonishes ESR consultants Madhawa Gunawardhene ("Gunawardhene")

and Williams for the unnecessary delay caused by their failure to follow outlined protocol for the

software integration.  (*See id*. at Ex. B).  In that email, Lee wrote,

> Madhawa and Dave,
>
> Had you followed the documentation regarding setup [in the] Oracle Receivables
> Guide [for] integrating Oracle Receivables with Vertex Quantum [Champion's
> existing software program], this would have been resolved weeks ago ... We have
> wasted so much time on a simple setup issue. Please use the resources available to
> you in the future.

(*Id*).  Williams responded to Lee that the mistake "f[ell] into the domain of his fault." (*Id*).

Further, as the "Go-Live" date neared, the emails begin to emphasize the urgency of having

the project finalized in time.  (*See id*.).  One outstanding issue was whether the system's printers

would be operational as scheduled.  On October 27, 2010, Collin McNeese, an Atrium employee,

noted that "[p]rinters take time to get setup [sic] ... and are rarely just plug and play.  If there are

printers which have to be in for go-live, then getting them setup [sic] needs to be a priority." (*Id*.).

ESR consultants, Gunawardhene and Gardener, confirmed that the printers were "a Go-Live

requirement."  (*Id*.).  Two days later, on October 29, 2010, another Atrium employee wrote to

Gardener outlining the problems he had encountered with a specific printer. (*Id*.).  That email reads,

"This should have been tested weeks ago and now everyone is scrambling to get this to work and no

one knows the fix."  (*Id*.).  Despite the "scrambling," the Oracle program went "live" at the

Champion facility, as planned, on November 1, 2010.  But even after that date, Atrium employees

continued to contact the ESR consultants with complaints regarding the implementation.  On

November 4, 2010, Lee wrote to Gardener asking him, "Why [] the consultants [were] running

production processes[.]" (*See id*. at Ex. C).  Lee added, "I thought we talked about this yesterday,"

and stated, "When you['re] back in Houston, can you please ask the consultants to transition processes to the appropriate users?  I'm tempted to pull production update access from the consultants to force the issue." (*Id.*).

On November 10, 2010, Susan Forrester ("Forrester"), Champion's Office Manager, wrote to Gardener and Gunawardhene about two "Oracle issues that … [still] need[ed] to be addressed." (*Id.*).  Apparently, Champion did not have "the capability to apply discounts" to orders, and orders for windows which should have been held, were being shipped and then rejected because the purchasers were not ready to receive them. (*Id.*).  Six days later, Forrester again wrote to Gardener and Rucks that "[i]t seems as though Oracle is rounding" the cost of certain orders. (*Id.*).

Later, on November 18, 2010, Martha Lawson, Champion's Finance Manager, wrote to Gardener that the company had "only invoiced $63 yesterday," noting, "[s]omething is wrong." (*Id.*).  The next day, Chad Smith, Atrium's Corporate Billing Manager, advised a number of Atrium and Champion employees that the "Month-To-Date sales through 11/18/2010" were "$1,529[,]513.84." (*Id.*).  Subsequently, Bill Van Ravenswaay ("Van Ravenswaay"), Atrium's Senior Vice President of Operations, forwarded the email to Gardener, noting that "this is insane," and asking,"What's going on?" (*Id.*).  Larry Freed ("Freed"), Atrium's Vice President and CIO, who also received the email, then sent it to Gardener, Lee, and Van Ravenswaay, with the comment that "[t]his is NOT comforting at all." (*Id.*).

Finally, on December 1, 2010, Arran Waters ("Waters"), a sales manager for Plaintiffs, wrote to Gardener, Lee, and Freed that he was "not able to ship [window] screens for customers … without manually having to generate each ticket." (*Id.*).  Waters complained that "[i]t was [his] understanding that the[] screen orders were going to be created in the background automatically."

14

(*Id.*).  Freed wrote to Gardener and Lee, noting that the problem "was initially identifie[d] on Nov. 4th," and he asked why "it [had] drop[ped] off the radar[.]" (*Id.*).

The evidence shows that these emails were either directed to Gardener, or that he was copied on each of them.  While Atrium may not have complained directly to Seitz, the contract does not require it to do so.  (Second Motion at Ex. 1, at ¶ 5).  It is clear that there is a fact question on whether Plaintiffs' notice to Gardener is sufficient to meet Atrium's duty under the contract.  Here, there is no showing that Plaintiffs "inten[ded] to relinquish a known right," as required, to establish a "waiver of rights under a contract." *Roberts*, 188 S.W.3d at 213; *see Guzman,* 63 S.W.3d at 528 (citing *Enterprise-Laredo Assocs. v. Hachar's Inc.,* 839 S.W.2d 822, 836 (Tex. App.—San Antonio 1992, writ denied)).  Defendant has failed to show, conclusively, that Plaintiffs "waived their breach of contract claim," and its motion on that claim must fail.

### *Limitation of Liability Provision*

In its second motion, ESR also argues that "Plaintiffs' damages are limited to the cost of a contractor to repair and/or remedy the identified breach," but that, because Atrium never provided notice of its dissatisfaction to Defendant, it has waived "even that amount of money."  (Second Motion at 5).  To support this limitation of liability argument, Defendant points to the following provision in the Master Agreement:

> ESR's consultants are experienced and are capable of performing the services to [Atrium's] satisfaction on schedule.  However, the consultants are in the supervision of [Atrium] and liability will be limited to replacing the consultant if [Atrium] is not fully satisfied with the performance of the consultant.

(*Id.* at Ex. 1, at ¶ 4).  Based on the plain language of this paragraph, it appears that if Atrium was "not fully satisfied" with ESR's work, Defendant's liability would be limited to replacing the

complained-of consultant. (*Id.*). However, Atrium has responded that "in order to *complain* about Defendant's work, [it] would have needed to receive enough information from ESR to enable Plaintiffs to discover that there were issues with the work in the first place." (Response to Second Motion at 16). Plaintiffs claim that "ESR failed to provide [them] with [an] honest analysis" of whether the project was ready to "Go-Live." (*Id.*). Defendant complains that although "Plaintiffs argue that they had no knowledge of the issues relating to Defendant's alleged failures," they also "allege [that] they raised numerous issues before and after Go-Live." (Reply to Second Motion at 18). Indeed, whether Plaintiffs had enough information that ESR consultants were "[in]capable of performing the services to [Atrium's] satisfaction on schedule," will determine whether their liability is limited. (*See* Second Motion at 5).

During the course of the project, emails between Gardener and Lee address whether the project could be completed on schedule.[3] (*See* Beth Lee Affidavit at Ex. B). On August 30, 2010, eight weeks before the anticipated "Go-Live" date, Lee asked, "Reece, do you know if the [requirements] list can be completed within the 6 weeks originally budgeted?" (*Id.*). Gardener responded that "[a]ssuming [they] d[id]n't hit major snags in the coding effort (bit bugs, etc.), … [they] should be able to get through the [] list within a 6 week timeframe." (*Id.*). Then again, on October 20, 2010, Lee wrote the following to Gardener in an email:

> I just want to make sure we have a good picture as to where we are at. Given that we were still loading data today, I'm not sure how we will be ready. Plus, I think there is a list of test issues that will need to be addressed and retested. Do you think we will be needing to push a week at this point?

---

[3]  Although Defendant has also objected to these emails, ESR has not specified any particular email which it finds unreliable. For that reason, the court will also consider this evidence. *See Breach of Contract* section, *supra.*

16

(*Id.*).  Gardener responded to Lee that he "th[ought they] [we]re still going to make it." (*Id.*).  He wrote that, although "there are a lot of test issues … [t]here is nothing that says we can't pull the plug next Wednesday." (*Id.*).  As detailed previously, however, when the software program went "live," a number of issues surfaced.  For instance, after November 1, 2010, ESR consultants were performing Champion personnel's "production process[ing]" work.  (*Id.* at Ex. C).  In addition, Champion could not apply discounts to orders.  (*Id.*).  In some cases, the software caused the company to accidentally ship windows, and in other instances, screen orders were not automatically generated as they should have been.  (*Id.*).  There were also complaints that Oracle was "rounding" invoices, and other notes that invoicing and sales numbers were "insane[ly]" inaccurate.  (*Id*)

From this evidence, it appears that ESR continued to assure Atrium that the implementation could "Go-Live," as planned, on November 1, 2010.  In viewing this evidence in the light most favorable to Plaintiffs, it seems that until ESR "pull[ed] the plug" and the numerous problems became apparent, Atrium did not realize that the software program was improperly implemented. *See Anderson*, 477 U.S. at 248.  For that reason, a fact question remains on whether ESR's consultants were, indeed, "capable of performing the services to [Atrium's] satisfaction on schedule," and whether Plaintiffs had sufficient information to allow them to determine whether they were "fully satisfied with the performance of th[ose] consultants." (*See* Second Motion at Ex. 1, at ¶ 4).  Given those questions, it is impossible to conclude, on this record, that Plaintiffs' damages are limited to the cost of replacing a consultant.  *See Hamilton*, 232 F.3d at 477.  As a result, Defendant's motion for summary judgment on this issue must be denied.

*Negligence*

Defendant further moves for summary judgment on Plaintiffs' claims for negligent misrepresentation, professional negligence, and gross negligence, arguing that they are barred by the "economic loss rule." (Second Motion at 5-6). ESR claims that its actions did not breach any duty of care that it may have owed to Plaintiffs, and that even if such a duty existed, Plaintiffs cannot show that Defendant's actions were the proximate cause of their injuries. (*Id.* at 7-9).

The Texas Supreme Court addressed the economic loss rule, most recently, in *Sharyland Water Supply Corporation v. City of Alton. See* 354 S.W.3d 407, 415-20 (Tex. 2011). That court stated that, under that doctrine, a party may not recover in negligence for purely economic losses. *See id.* (citing *Equistar Chems., L.P. v. Dresser-Rand Co.*, 240 S.W.3d 864, 867 (Tex. 2007)). It is true that, "if the defendant's conduct ... would give rise to liability independent of the fact that a contract exists between the parties, the plaintiff's claims may also sound in tort." *Southwestern Bell Tel. Co. v. Delanney* , 809 S.W.2d 493, 494 (Tex. 1991). However, if "the defendant's conduct ... would give rise to liability only because it breaches the parties' agreement, the plaintiff's claim sounds only in contract." *Id.* Indeed, "[t]o be entitled to damages for negligence, a party must plead and prove either a personal injury or property damage as contrasted to mere economic harm." *Express One Int'l, Inc. v. Steinbeck*, 53 S.W.3d 895, 899 (Tex. App.—Dallas 2001, no pet.).

In their Complaint, Plaintiffs allege only that they "incurred economic damages" because of the failed implementation under the Master and Implementation Agreements. (Complaint at 9). In fact, their damages expert witness, Gary Durham, reports that Atrium incurred $1,458,712 in "increased costs and lost revenue that constitute economic damages." (Docket Entry # 49, Ex. B,

at 2). From this evidence, it does not appear that Plaintiffs are entitled to damages for negligence. *See Steinbeck*, 53 S.W.3d at 899.

Further, a review of Plaintiffs' negligence-based claims identifies the source of their complaints. In the negligent misrepresentation allegations, Plaintiffs state that "ESR made misrepresentations to Atrium and Champion in the course of ESR's business," and that,

> ESR [] supplied false information to Atrium and Champion and/or did not exercise reasonable care or competence in obtaining or communicating the information, including (1) ESR and its consultants' experience and capability to perform the services to Atrium and Champion's satisfaction on schedule; (2) that ESR would monitor the progress of the project and will make every effort to adhere to the schedule of dates; (3) that ESR would provide the deliverables set forth in the Project Contract; and (4) that the Oracle Implementation was ready to go live when in reality numerous problems existed.

(Complaint at 11-12). In Plaintiffs' professional negligence claim, they allege that ESR breached its duty of reasonable care by the following conduct:

> (1) failing to exercise reasonable care, skill or competence in performing planning and design services, including material requirements planning relating to design; (2) failing to use reasonable care, skill or competence in obtaining or communicating information, including the experience and capability of ESR and its consultants to perform the services as represented ... (3) failing to complete the work, project activities, phases and deliverables in a reasonable and competent manner; (4) failing to monitor the progress of the Oracle Implementation and make every effort to adhere to the schedule of dates and complete all aspects of the engagement competently and timely; (5) otherwise failing to implement the Oracle E-Business Suite as a prudent provider of services should have done; and (6) going live with the Oracle Implementation before the system was ready and failing to disclose that to Atrium and Champion.

(*Id*. at 13-14). Finally, the gross negligence claim merely references the "ERP [enterprise resource planning] implementation services [] set forth" in the professional negligence allegations, and asserts that ESR "engaged in [those] acts and omissions" with "an extreme de[g]ree of risk," and with "conscious indifference to" Plaintiffs' rights. (*Id*. at 14). A review of these allegations reveals that

each relates to the subject matter of the contract between the parties. (*Id.* at 11-14). They reference the "experience and capability" of the ESR consultants, as well as the contract's "deliverables" and "schedule." (*Id.*). It is clear that Plaintiffs do not claim any loss that would arise "independent of the fact that a contract exists between the parties." *See Delanney*, 809 S.W.2d at 494. For that reason, the economic loss rule acts to bar Plaintiffs' negligence-based claims, unless some exception applies in this instance.

The Texas Supreme Court has rejected the notion that a party "can never recover economic damages for a tort claim." *Sharyland*, 354 S.W.3d at 418. It reasoned that, to do so, "would overlook [] all of the tort claims for which courts have allowed recovery of economic damages even absent physical injury or property damage."[1] *Id.* The Texas Supreme Court has also found that "some contracts involve special relationships that may give rise to duties enforceable as torts, such as professional malpractice." *Delanney*, 809 S.W.2d at 494 n.1. However, this duty is not lightly created. *See Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 288 (Tex. 1998). "To impose an informal fiduciary duty in a business transaction, the special relationship of trust and confidence must exist prior to, and apart from, the agreement made the basis of the suit." *Id.* "[M]ere subjective trust does not ... transform arm's-length dealing into a fiduciary relationship." *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 177 (Tex. 1997). "Although ... the existence of a confidential relationship is ordinarily a question of fact, when the issue is one of no evidence, it becomes a question of law." *Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.*,

---

[1] Those claims include actions for "negligent misrepresentation, legal or accounting malpractice, breach of fiduciary duty, fraud, fraudulent inducement, tortious interference with contract, nuisance, wrongful death claims related to loss of support from the decedent, business disparagement, and some statutory causes of action." *Id.* (Internal citations omitted). The cases cited by the Texas Supreme Court for negligent misrepresentation include parties who were not in contractual privity with one another. *See Grant Thornton, LLP v. Prospect High Income Fund, ML CBO IV*, 314 S.W.3d 913 (Tex. 2010); *Fed. Land Bank Ass'n of Tyler v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1991). Because there is no question that a contract exists between Plaintiffs and Defendant, these cases are inapplicable in this instance.

823 S.W.2d 591, 594 (Tex. 1992).  Because Plaintiffs here have asserted a claim for "information technology professional negligence," it is necessary to determine whether any "special relationship" existed with ESR that is sufficient to circumvent the economic loss rule.  *See id*.  To support their claim for "professional negligence," Plaintiffs point out that, in the Implementation Agreement, ESR "propose[d] its value-added services and best practices from the expertise [it] gained through offering similar services for other customers globally." (Implementation Agreement at 5).  In addition, Defendant claimed to have "experience [] executing end-to-end Oracle Application Implementation programs worldwide across different industries." (*Id*. at 33).  However, there is no evidence that Plaintiffs and ESR had any relationship "prior to, and apart from," entering into these agreements.  *See Associated Indem. Corp.*, 964 S.W.2d at 287.  Instead, the agreements at issue in this litigation were arms-length transactions that both parties entered into for their mutual benefit.  Plaintiffs' "mere subjective trust does not, as a matter of law, transform arm's-length dealing into a fiduciary relationship." *See Swanson*, 959 S.W.2d at 177.  Because Plaintiffs have failed to raise an issue of material fact on whether there was a pre-existing confidential relationship with ESR, they have not met their burden to show that Defendant owed them a fiduciary duty. *See Piazza's Seafood World, LLC v. Odom*, 448 F.3d 744, 752 (5th Cir. 2006).  The losses claimed in this litigation arise only from the contractual duties between the parties, and for that reason, Plaintiffs are subject to the economic loss rule.  With that finding, it is unnecessary to decide whether Defendant breached any duty of care or whether any alleged breach proximately caused Plaintiffs' damages.  Accordingly, Defendant's motion for summary judgment on Plaintiffs' claims for professional negligence, gross negligence, and negligent misrepresentation is granted.

21

*Breach of Warranty*

Finally, Plaintiffs claim that Defendant breached a warranty because it "made representations to [Plaintiffs] about the quality or characteristics of the[ir] services ... that became part of the basis of the Master Agreement and [the Implementation Agreement]." (Complaint at 13).  Although it does not cite any authority in support of its argument, Defendant seeks summary judgment on Plaintiffs' claim for breach of warranty, arguing that there is "no provision for 'warranty'" in the Master Agreement. (Second Motion at 10).  ESR also contends that, while this claim is proper "via a breach of contract" action, there is no separate claim for breach of warranty.  (*Id.*).  Plaintiffs, on the other hand, insist that an issue of fact exists on this claim.  (Response to Second Motion at 25–27).

In Texas, to succeed on a claim for a breach of warranty for services, a plaintiff must show that: (1) the defendant sold services to the plaintiff; (2) the defendant made a representation to the plaintiff about the characteristics of the services by affirmation of fact, by promise, or by description; (3) the representation became part of the basis of the bargain; (4) the defendant breached the warranty; (5) the plaintiff notified the defendant of the breach; and (6) the plaintiff suffered injury. *See Paragon Gen. Contractors, Inc. v. Larco Constr., Inc.*, 227 S.W.3d 876, 886 (Tex. App.—Dallas 2007, no pet.) (citing *Southwestern Bell Tel. Co. v. FDP Corp.*, 811 S.W.2d 572, 576–77 & n.3 (Tex. 1991); *Mills v. Pate*, 225 S.W.3d 277, 289–90 (Tex. App.—El Paso 2006, no pet.); *Great Am. Prods. v. Permabond Int'l*, 94 S.W.3d 675, 681 (Tex. App.—Austin 2002, pet. denied); citing Tex. Bus. & Com. Code Ann. §§ 2.313(a), 2.607(c)(1) (Vernon 1994)).  It is settled that breach of warranty and breach of contract are distinct causes of action. *See Medical City Dallas, Ltd. v. Carlisle Corp.*, 251 S.W.3d 55, 60 (Tex. 2008); *accord FDP Corp.*, 811 S.W.2d at 576.

22

Nevertheless, breach of warranty is "a part of the basis of a bargain and is contractual in nature." *Medical City Dallas, Ltd.*, 251 S.W.3d at 60. In this way, a breach of warranty claim, "involves a party seeking damages based on an opponent's failure to uphold its end of the bargain." *Id.*

On May 17, 2010, Atrium and ESR entered into the Implementation Agreement to transition the Champion facility to the Oracle eBusiness Suite program. In that Agreement, ESR stated that the new system would "support Champion Window's core ERP [enterprise resource planning] process flows in the areas of ***Order Management, Inventory, Manufacturing and Shipping, and Financials and Purchasing***." (Implementation Agreement at 11 [emphasis in original]). The Implementation Agreement also detailed the "Roles and Responsibilities" of the parties, in which ESR agreed to "monitor the progress of the project and [to] make every effort to adhere to the schedule of dates." (*Id.* at 28). Defendant also stated that, "[i]n the event of slippage, [it] w[ould] inform Champion Window with reasons for such slippage from planned schedules and the measure adopted to counter the slippage." (*Id.*). The contract specified further that Gardener, the project manager, would "monitor the progress of the activities" and "prepare weekly project status updates." (*Id.* at 27). Gardener was also to meet with Atrium's project manager, at a "weekly status meeting[]," and to track "[a]ll outstanding issues" in the status reports. (*Id.*).

On this record, the Master Agreement outlines the "Work to be Performed and Services to be Rendered." (Master Agreement at 1 [emphasis omitted]). For that reason, Plaintiffs have satisfied the first prong of their breach of warranty action, a showing that Defendant sold services to them. *See Paragon Gen. Contractors, Inc.*, 227 S.W.3d at 886. Further, in the Implementation Agreement, ESR made specific statements about the "benefits" of the Oracle program to Champion's business, as well as the details that it would undertake to complete the project. (Implementation

Agreement at 11, 27-28; Patterson Report at Ex. B).  These representations "'in the contract' show[]

that [they] became part of the basis of the bargain."  *See Paragon Gen. Contractors, Inc.*, 227

S.W.3d at 886.  From this evidence, Plaintiffs have raised an issue of fact on whether the timeline

provided for the project was sufficient, and whether the program conformed to ESR's claims in the

Implementation Agreement.  *See Odom*, 448 F.3d at 752.  Plaintiffs have further met their burden

to show that an issue of material fact remains on whether Defendant's purported breach caused them

damages.  For these reasons, the court finds that Defendant's motion for summary judgment on

Plaintiffs' breach of warranty claim is denied.

  *Counter-Claim*

   In its counter-claim, Defendant alleges that Atrium wrongfully withheld the final payment

of $76,580, representing the balance due for its work completed under the contract.  (*See* Counter-

Claim at 11-12; First Motion at 2).  Defendant claims that Atrium is not excused from making the

payment because it never informed ESR that it was dissatisfied with ESR's work, as required by the

Master Agreement.  (*Id.* at 2-3).  As detailed above, however, email conversations between the

parties show that there is a fact issue on whether Plaintiffs sufficiently notified Defendant of their

dissatisfaction with the work.  (*See* Second Motion at 5 & Ex. 1, at 1-2; First Motion at Ex. 1, at ¶

5).  As a result, summary judgment is inappropriate on Defendant's counter-claim.

   In addition, the emails in question detail that, in fact, the Oracle system was not fully

functional as of the "Go-Live" date.  (*See* Beth Lee Affidavit at Ex. C).  Indeed, they show that, after

November 1, 2010, ESR consultants were performing Champion personnel's "production

process[ing]" work.  (*Id.*).  They also reveal that, because of the problems with the Oracle system,

Champion was rendered unable to apply discounts to orders, or to ensure that the correct orders were

taken and product shipped. (*Id.*). Further, emails show that there were client complaints that Oracle was "rounding" invoices, or making "insane[ly]" inaccurate calculations. (*Id*). This evidence is sufficient to create a question of fact on whether ESR breached the contract by not "perform[ing] the services to [Atrium's] satisfaction on schedule," as the contract required. The Texas Supreme Court has observed the following:

> It is a fundamental principle of contract law that when one party to a contract commits a material breach of that contract, the other party is discharged or excused from further performance.

*BFI Waste Sys. of N. Am. v. North Alamo Water Supply Corp.,* 251 S.W.3d 30, 30–31 (Tex. 2008) (citing *Mustang Pipeline Co. v. Driver Pipeline Co.,* 134 S.W.3d 195, 196 (Tex. 2004). In this case, if ESR is found to have breached the contract, Plaintiffs would be excused from paying the remainder due to Defendant. *See id.* Accordingly, this serves as an additional reason that summary judgment is inappropriate in this instance.

Further, Defendant points to a "termination clause" in the Master Agreement as another ground requiring Plaintiffs to pay the outstanding amount allegedly due.[2] (*See* Second Motion at 5). The clause provides, as follows:

> [Atrium] may terminate this Agreement, or assignment period without cause, at any time in its sole discretion, upon a thirty (30) days (Calendar) written notice to ESR and with cause with zero (0) days notice, provided that [Atrium] shall pay to ESR all unpaid charges for services rendered by ESR up to the termination of the project assignment or such requisition period, as the case may be.

(Master Agreement at 3). Defendant claims that because Plaintiffs never terminated the contract, they owe ESR all amounts billed. (*See* Second Motion at 5). To that statement, Plaintiffs respond

---

[2] Although this argument is included in Defendant's Second Motion for Summary Judgment on Plaintiffs' claims, ESR acknowledges that it pertains to "the subject of [its] counter-claim." (Docket Entry # 44 at 5). In addition, Plaintiffs' Response to Defendant's present motion incorporates their arguments on this point. (Plaintiffs' Response at 17). For these reasons, discussion of this contention is more appropriate in this order.

that, "the Master Agreement merely allows Atrium to terminate the contract … and provides that *if Atrium terminates the contract*, Atrium shall pay ESR." (Response to Second Motion at 18 [emphasis in original]). Plaintiffs argue further that this contract provision is inapplicable because the outstanding invoices were "billed separately from the original contract." (*Id.* at 18 & n. 49). It is clear, then, that Plaintiffs may still be able to recover, provided that the termination clause is not Plaintiffs' exclusive remedy for breach. This is so because, under Texas law, "[i]n the event of a breach a party to a contract can pursue any remedy which the law affords in addition to the remedy provided in the contract, unless the contract declares the remedy to be exclusive." *Tabor v. Ragle*, 526 S.W.2d 670, 676 (Tex. Civ. App.—Fort Worth, writ ref'd n.r.e.). For that reason, "although Texas law permits a non-breaching party to cease performance under a contract and/or sue for damages," parties to an agreement may also specify the remedies available for a breach of contract. *See Myriad Dev., Inc. v. Alltech, Inc.*, 817 F. Supp. 2d 946, 964 (W.D. Tex. 2011) (citing *SAVA Gumarska In Kemijska Indus. D.D. v. Advanced Polymer Sci., Inc.*, 128 S.W.3d 304, 305 (Tex. App.—Dallas 2004, no pet). The remedies allowed by a contract may be "permissive" or "exclusive." *See Pelto Oil Corp. v. CSX Oil & Gas Corp.*, 804 S.W.2d 583, 586 (Tex. App.—Houston [1st Dist.] 1991, writ denied). "An exclusive remedy precludes other remedies, and a permissive remedy does not." *Myriad Dev.*, 817 F. Supp. 2d at 964 (citing 49 *David R. Dow & Craig Smyser*, TEXAS PRACTICE: CONTRACT LAW § 10.3 (2010)). More importantly, "the mere fact that the contract includes a particular remedy does not mean that such remedy is exclusive." *Id.*; *see Pelto Oil Corp.*, 804 S.W.2d at 586; *Bifano v. Young*, 665 S.W.2d 536, 539 (Tex. App.—Corpus Christi 1983, writ ref'd n.r.e.). Accordingly, a contractual remedy is not deemed to be exclusive unless the parties have indicated or clearly declared their intent that it be exclusive. *See Myriad*, 817

26

F. Supp. 2d at 964 (citing *Vandergriff Chevrolet Co. v. Forum Bank,* 613 S.W.2d 68, 70 (Tex.

App.—Fort Worth 1981, no writ)).  In determining the parties' intent, it is well-settled that "[a]n

unambiguous contract will be enforced as written." *David J. Sacks, P.C. v. Haden,* 266 S.W.3d 447,

450 (Tex. 2008). Here, the language in the termination provision provides only that Plaintiffs *"may*

terminate the agreement."  The term "may" is permissive language.  *See Myriad,* 817 F. Supp. 2d

at 965 (noting that "[t]ermination of a contract is permitted, but not required, when a contract

provides that one party 'may terminate' the contract."); *see also Van-Tex, Inc. v. Pierce,* 703 F.2d

891, 899 (5th Cir. 1983) (recognizing that the term "may" is permissive).  Such permissive language

implies that if Atrium chooses to terminate the agreement, it can, but simply is not required to do so.

Indeed, because the termination clause is not included as Plaintiffs' exclusive remedy, they "can

pursue any remedy which the law affords in addition to the remedy provided in the contract." *See*

*Tabor,* 526 S.W.2d at 676.  For that reason, the termination clause does not create any additional

duties for Plaintiffs, or lend any support to ESR's counter-claim.

  As a final matter, Defendant has provided support for the attorney's fees it claims to have

incurred in its attempts to collect on the allegedly outstanding payments.  (First Motion at Ex. D).

Defendant's attorney, Luke C. Carrabba ("Carrabba"), has signed an affidavit setting forth his

credentials, and stating the following:

> ESR has incurred approximately 380 hours in attorney time since the filing of the
> counter-claim on April 21, 2011 through the end of June 2012.  An additional 30
> hours of attorney time is anticipated for the drafting of the Motions for Summary
> Judgment herein, replies thereto, and potential hearings related to same.

(*Id.*).  Carrabba also reported that $350.00 per hour is a reasonable and customary rate for work of

this nature, given the complexity of the case, and the time constraints and voluminous documents

and discovery.  (*Id.*).  "For more than a century, Texas law has not allowed recovery of attorney's

fees unless authorized by statute or contract." *Tony Gullo Motors I, LP v. Chapa*, 212 S.W.3d 299, 310-11 (Tex. 2007). That is, "[a]bsent a contract or statute, trial courts do not have inherent authority to require a losing party to pay the prevailing party's fees." *Id.* However, in those instances when fees are proper for a prevailing party, "[t]he fee applicant bears the burden of proving that the number of hours and the hourly rate for which compensation is requested is reasonable." *Riley v. City of Jackson, Miss.*, 99 F.3d 757, 760 (5th Cir. 1996) (citing *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983)). "[P]laintiffs seeking attorney's fees are charged with the burden of showing the reasonableness of the hours billed and, therefore, are also charged with proving that they exercised billing judgment." *Saizan v. Delta Concrete Prods. Co.*, 448 F.3d 795, 799 (5th Cir. 2006). "Billing judgment requires documentation of the hours charged and of the hours written off as unproductive, excessive, or redundant." *Id.* "The determination of whether the applicant's reported hours are repetitive and duplicative is a finding of fact by the district court and will not be disturbed unless clearly erroneous." *Riley*, 99 F.3d at 760. Here, because Defendant has not succeeded on its motion for summary judgment, an award of attorney's fees is also not proper in this instance. However, even if an award was proper at this time, Carrabba's statement does not document the charges related to the 380 hours he claims to have worked. As a result, there is no way for the court to determine whether these charges were "unproductive, excessive, or redundant," or even what tasks are attributed to these hours. *See Saizan*, 448 F.3d at 799. Given the lack of evidence, it would be impossible to conclude that the hours claimed are reasonable. *See Riley*, 99 F.3d at 760. For these reasons, Defendant's request for attorney's fees is denied at this time.

In sum, summary judgment is appropriate only on Plaintiffs' negligence claims. On those claims, then, Defendant is entitled to summary judgment, and those claims must be dismissed.

28

Genuine issues of material fact, however, exist on all other matters raised by the parties to this action.  As a result, the court denies Defendant's first motion for summary judgment, and grants Defendant's second motion only on Plaintiffs' claims for "information technology professional negligence," gross negligence, and negligent misrepresentation.

**Conclusion**

Based on the foregoing discussion:

It is **ORDERED** that Defendant's First Motion for Summary Judgment is **DENIED**.

It is also **ORDERED** that  Defendant's  Second  Motion  for Summary Judgment is **GRANTED**, in part, and **DENIED**, in part.

It is further **ORDERED** that Plaintiffs' claims for "information technology professional negligence," gross negligence, and negligent misrepresentation are **DISMISSED**.  All remaining claims are still at issue in this case.

The Clerk of the Court shall enter this order and provide a true copy to all counsel of record.

**SIGNED** at Houston, Texas, this ⟨ day of _____, 2012.

_____
**MARY MILLOY**
**UNITED STATES MAGISTRATE JUDGE**